U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | RWT 1 U CR 0694 |
| v. | * | CRIMINAL NO. |
| | * | |
| LAUREN STEVENS, | * | (Obstruction of Proceeding, 18 U.S.C. § |
| | * | 1512; Falsification/Concealment of |
| Defendant | * | Documents, 18 U.S.C. § 1519; False |
| | * | Statements, 18 U.S.C. § 1001; Aiding and |
| | * | Abetting, 18 U.S.C. § 2) |
| | * | |

*******

### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### INTRODUCTORY ALLEGATIONS

At times material to this Indictment, unless otherwise alleged:

### Background

1.     Defendant **LAUREN STEVENS** was the Vice President and Associate General

Counsel of SmithKlineBeecham Corporation d/b/a GlaxoSmithKline ("GSK").

2.     GSK was a corporation that manufactured, promoted, and distributed for sale

prescription drugs, including Wellbutrin SR ("Wellbutrin").

3.     On or about October 9, 2002, the United States Food and Drug Administration

("FDA") sent a letter to GSK that stated that the FDA had become aware of information that

GSK had possibly promoted the use of Wellbutrin for an unapproved use – specifically for

weight loss. The FDA asked GSK about its Wellbutrin promotional programs and asked GSK to

provide materials related to Wellbutrin promotional programs, including copies of all slides,

videos, handouts, and other materials presented or distributed at any GSK program or activity

related to Wellbutrin. In the letter, the FDA also asked GSK to identify any compensation provided to individuals involved in programs or activities related to Wellbutrin.

4.    **STEVENS** was the Vice President and attorney at GSK who was in charge of GSK's response to the FDA's inquiry and investigation. As part of that response, **STEVENS** led a team of lawyers and paralegals who gathered documents and information.

### The FDA and the FDCA

5.    The FDA was the federal agency of the United States responsible for protecting the health and safety of the public by enforcing the federal Food, Drug, and Cosmetic Act ("FDCA"). The FDA's headquarters were located within the District of Maryland.

6.    With certain limited exceptions not pertinent here, a prescription drug could not be distributed in interstate commerce without FDA approval. To gain FDA approval for a particular use, data from well-controlled clinical studies had to demonstrate that the drug would be safe and effective. As part of the approval process, the FDA also had to approve the drug's labeling, which set forth detailed information about the drug, including the approved medical conditions of use, dosages, and patient population(s).

7.    Uses that were not in the approved labeling were known as off-label uses.

8.    Under the FDCA, the drug's manufacturer, its representatives, and those speaking on its behalf could not lawfully market and promote the drug for off-label uses.

9.    The FDCA prohibited the distribution in interstate commerce of an unapproved new drug or a misbranded drug. Promoting a drug for an unapproved use rendered the drug misbranded.

2

10.     The Division of Drug Marketing, Advertising, and Communications ("DDMAC")
was the office within the FDA responsible for reviewing promotional materials and programs,
investigating complaints about alleged promotional violations, and initiating enforcement actions
for promotional activities that were not truthful, balanced, and consistent with the approved
labeling.

11.     Wellbutrin was approved by the FDA for a single use:  the treatment of major
depressive disorder in patients age 18 or older.

### STEVENS' Collection of Information and Evidence of GSK's Promotion of Wellbutrin for Unapproved Uses

12.     On or about October 25, 2002, **STEVENS** participated in a telephone conference
call with representatives of the FDA in which the FDA informed GSK that it expected
GSK to attempt to obtain and provide to the FDA materials and documents presented at
GSK-sponsored promotional programs by health-care professionals who were acting on behalf of
GSK, even if such materials and documents were not created by or under the custody or control
of GSK.  During that call, **STEVENS** and GSK agreed to seek to obtain and provide to the FDA
such presentation materials.

13.     On or about October 29, 2002, **STEVENS** sent a letter to the FDA in Rockville,
Maryland, in which she stated, in part:

> You further confirmed that it is your expectation that GSK attempt to obtain and
> provide to you materials and documents presented at GSK-sponsored promotional
> programs, even if not created by, or under the custody or control of GSK.  We
> have committed to making a good-faith effort to obtain additional presentation
> materials, and to provide them to you if we are able to obtain the consent of the
> owner of such materials.  We both recognize that some individuals may refuse to
> provide the requested materials.  In this event, we have agreed to keep you
> informed of our inability to secure such materials.

3

14.    In her October 29, 2002 letter, **STEVENS** also confirmed that the time period as to which GSK would initially respond to the FDA's request for information and materials was from January 1, 2001, to October 9, 2002.

15.    In a telephone call with the FDA on or about November 5, 2002, **STEVENS** agreed that GSK would try to collect presentation materials from Wellbutrin speakers and, to the extent GSK was unable to get the materials, would discuss the issue with the FDA.

16.    In preparing its response to this FDA inquiry, **STEVENS** identified more than 2,000 GSK speakers who had given Wellbutrin promotional talks on behalf of GSK in 2001-2002.

17.    On or about December 12, 2002, **STEVENS** sent a letter to approximately 550 of the speakers who had given promotional talks on behalf of GSK for Wellbutrin and asked that they send in the slides and materials they used during these promotional talks. In her letter, **STEVENS** stated: "FDA has requested that GSK provide all materials and documents presented at GSK-sponsored speaker programs for Wellbutrin SR during the years of 2001-2002." **STEVENS** also stated in her letters to the doctors that GSK intended to cooperate fully in providing this information to the FDA and that GSK could not guarantee the confidentiality of information supplied to the FDA.

18.    GSK received slides and other materials from approximately 40 of the approximately 550 promotional speakers to whom **STEVENS** sent her December 12, 2002 letter.

19.    **STEVENS** reviewed the slides and other materials produced by the approximately 40 promotional speakers who responded to her December 12, 2002 letter.

4

20.     Thereafter, **STEVENS** sent letters to 28 of these promotional speakers in which

she stated that the slides and materials they had sent her contained information about unapproved

uses of Wellbutrin, in violation of the FDA's requirements.  In each letter, **STEVENS** stated:

> We have reviewed the content of your presentations and determined that they
> contain material relating to GSK products (e.g. Wellbutrin SR) and uses that are
> not currently FDA-approved indications for those products.  Any affirmative
> presentation in a GSK-sponsored non-independent program suggesting that a GSK
> product is effective in conditions that are not approved indications is inconsistent
> with FDA's requirements, GSK policy, and your contract with GSK.

### STEVENS' Collection of Information about Dr. P

21.     While responding to the FDA's inquiry, **STEVENS** gathered information that

demonstrated that a physician in Michigan (hereinafter "Dr. P.") had spoken at about 488

Wellbutrin promotional events sponsored by GSK in 2001-2002.

22.     Prior to sending her responses to the FDA's inquiry, **STEVENS** learned that

during these events Dr. P had repeatedly promoted the use of Wellbutrin for unapproved uses.  In

or around December 2002, Stevens wrote in her notes:

> *[DR. P] ISSUE*
>
> —>     *det'd that he has been discussing WBSR at GSK-*
>          *sponsored events & using off-label info –*
>
> *Broader issue:  what has Co done?  What is risk*
>          *to Co. w/ respect to the rel. w/ [DR. P]*
>          *– Is he someone we have invested a great deal*
>          *of $ in, liking what he says; providing*
>          *him opps for $*
>
> *Govt might say:*
>          *FDA:  off-label – Co. liked it/condoned it as*
>                  *evid'd by proliferation of prez*
>          *OIG:  paymts to [DR. P] at issue*
>                  *—> pay to Rx?*

5

23. In or about January 2003, **STEVENS** met with Dr. P. Around that time she received his presentation slides, handouts distributed during his promotional presentations on behalf of GSK, notes of his presentation, and an audio cassette of his lecture, which showed that Dr. P repeatedly promoted the use of Wellbutrin for unapproved uses, including weight loss.

### STEVENS' Collection of Information about Dr. H

24. While responding to the FDA's inquiry, **STEVENS** gathered information that demonstrated that a physician in Vermont (hereinafter "Dr. H") had spoken at about 511 Wellbutrin promotional events sponsored by GSK in 2001-2002.

25. Prior to sending her responses to the FDA's inquiry, **STEVENS** learned that during these events Dr. H had repeatedly promoted the use of Wellbutrin for unapproved uses.

### STEVENS' False Representations To and Concealing of Evidence from the FDA

26. **STEVENS** signed and sent to the FDA a series of letters, with documents enclosed, in which she made materially false statements and concealed and covered up documents and other evidence that showed the extent of GSK's promotion of Wellbutrin for unapproved uses.

27. **STEVENS** made the false statements and withheld documents she recognized as incriminating with the goal of curtailing further FDA investigation and avoiding or minimizing any FDA regulatory action against GSK and any other potential government investigations or potential enforcement actions against GSK

28. Despite her representation to the FDA in October 2002 that she would gather and produce the slides used by promotional speakers on behalf of GSK, **STEVENS** nonetheless:

6

a.   represented that she had completed the production requested by the FDA when in fact she had withheld from the FDA the slides she gathered from the 40 doctors who produced their slides in response to **STEVENS'** December 12, 2002 letter, which she had promised to produce and which she recognized contained incriminating evidence of potential off-label promotion by GSK;

b.   denied that GSK had materials and activities promoting Wellbutrin for uses other than those consistent with the label even though she had determined that 28 of those approximately 40 doctors were using materials that discussed the use of Wellbutrin for unapproved uses during Wellbutrin promotional presentations on behalf of K-Corp;

c.   claimed that GSK's activities were consistent with the product label when she knew but did not disclose to the FDA that Dr. P, who had been a top speaker for GSK in 2001-2002, had routinely discussed off-label uses of Wellbutrin in his promotional slides and handouts; and did not produce the documents requested and promised by GSK, including the speaker slides, handouts, and audio cassette of Dr. P's standard lecture that GSK had gathered from Dr. P and that reflected this promotion for uses not consistent with the Wellbutrin label;

d.   claimed that GSK's promotional materials and activities were consistent with the product label when she knew but did not disclose to the FDA that Dr. H, who had been a top speaker for GSK in 2001-2002, had routinely discussed off-label uses of Wellbutrin in his promotional slides and handouts; and did not produce the documents requested and promised by GSK, including the speaker slides of Dr. H's standard lecture that GSK had gathered from Dr. H that reflected this promotion for uses not consistent with the Wellbutrin label, with the exception of one set of Dr. H's slides that she produced only after learning that the FDA had independently received the same slides.

## STEVENS' February 28, 2003 Letter

29.   On or about February 28, 2003, **STEVENS** sent a letter to the FDA that included

the following false and misleading representations:

a.   "GSK has not developed, devised, established, or maintained any program or activity to promote or encourage, either directly or indirectly, the use of Wellbutrin SR as a means to achieve weight loss or treat obesity. . . . GSK's promotional material and activities for Wellbutrin SR are

7

consistent with the approved Prescribing Information and the
supporting clinical data."

b.    "GSK has not developed or maintained promotional plans or activities to
directly or indirectly promote Wellbutrin SR for weight loss or the
treatment of obesity."

c.    "GSK has two types of advisory boards – National Advisory Boards and
Local Advisory Boards. . . .  GSK, through its field-based Market
Development Managers, has established Local Advisory Boards in certain
sales regions for the purpose of obtaining specific advice from health care
professionals in that locale for Wellbutrin SR and/or issues relating to the
therapeutic area of depression.  Pursuant to GSK policy, no sales region
may have more than two Local Advisory Boards, and no such board may
meet more than twice per year."

30.    By February 28, 2003, **STEVENS** knew that GSK had maintained programs and

activities that directly and indirectly promoted and encouraged the use of Wellbutrin to achieve

weight loss and treat obesity, and that GSK's promotional activities for Wellbutrin had not been

consistent with the approved prescribing information.

31.    By February 28, 2003, **STEVENS** knew that GSK had paid numerous physicians

in 2001-2002 to give promotional talks about Wellbutrin that included slide presentations about

unapproved uses of Wellbutrin, including for weight loss.

32.    By February 28, 2003, **STEVENS** knew that GSK held many "special issue

boards" – in addition to national and local advisory boards concerning Wellbutrin.  Dr. H and Dr.

P presented information at many of these "special issue boards."  Unapproved uses of Wellbutrin

were presented and promoted at many of the "special issue boards" that physicians were paid by

GSK to attend.

8

## STEVENS' March 28, 2003 Letter

33.    On or about March 28, 2003, **STEVENS** continued to conceal information and materials from the FDA and sought to further mislead the FDA by sending the FDA a letter that included the false and misleading representation with respect to GSK's speaker programs during 2001 and 2002 that: "Attendees were not paid, reimbursed, or otherwise compensated to attend these events, with the exception of reimbursement for parking fees in some cases."

34.    By March 28, 2003, **STEVENS** also knew that attendees sometimes received gifts, gift certificates, recreational activities, entertainment, and other compensation as part of Wellbutrin promotional events. In fact, **STEVENS** deliberately withheld this and other information from the FDA, and removed a column listing such activities and entertainment from the "Event Spreadsheet" that she provided to the FDA as an Appendix to the March 28, 2003 letter. The column that she caused to be deleted showed that attendees of certain programs were taken at GSK expense to programs such as Disney on Ice, European Pheasant Hunts, spa treatments, skiing trips, sporting events, U2 concerts, and Broadway shows of various sorts. She then falsely represented that no payment, reimbursement, or other compensation other than parking fees had been provided to the attendees.

## STEVENS' May 21, 2003 "Final" Letter and Completion of Production

35.    As **STEVENS** prepared to finish GSK's response to the FDA's inquiry, **STEVENS** discussed with the other lawyers involved in responding to the FDA whether to produce the slide sets and presentation materials gathered from the physicians who had made promotional presentations on behalf of GSK concerning Wellbutrin. **STEVENS** requested that other lawyers involved in the response to the FDA prepare a memorandum summarizing their conversations about the pros and cons of producing these slide sets to the FDA, even though

**STEVENS** had already committed to the FDA in writing that she would produce such materials.

36.    On or about March 18, 2003, other lawyers involved in responding to the FDA

provided the memorandum that **STEVENS** had requested.  This memorandum stated:

"As you have requested, we are providing a list of the pros and cons of submitting
physician presentations on Wellbutrin SR to FDA . . . .

|              Pros              |              Cons              |

- Responds to FDA's request 5(a) for copies of all materials presented by individuals identified in response to item 3 and relating to Wellbutrin SR.

- Potentially garners credibility with FDA.

- Provides information that appears to promote off-label uses of Wellbutrin for weight loss as well as ADHD, sexual dysfunction, and other unapproved uses.

- Potentially demonstrates GSK's lack of control over GSK sales representatives.

- Potentially demonstrates GSK's lack of control over physician speakers.

- Provides incriminating evidence about potential off-label promotion of Wellbutrin SR that may be used against GSK in this or in a future investigation."

37.    **STEVENS** determined not to produce any of these physician presentations to the

FDA with the final production.  Instead, on or about May 21, 2003, **STEVENS** sent a letter to

the FDA which stated that it was GSK's "last submission " and "final" response to the FDA's

requests and falsely stated: "With this final submission, we complete our production of

information and documents in response to the requests in your letter dated October 9, 2002 and

additional requests raised in your teleconference with GSK on January 21, 2003 concerning

Wellbutrin SR."

38.    In this final letter, **STEVENS** also continued to falsely represent that GSK had

been promoting Wellbutrin consistently with the product label.  She stated:

      a.    "In the final analysis, all of the information consistently and clearly points
           to the same conclusion – GSK has not developed, devised, established, or
           maintained any program or activity to promote, either directly or
           indirectly, the use of Wellbutrin SR to achieve weight loss or treat
           obesity."

      b.    "GSK's promotional material and activities for Wellbutrin SR are
           consistent with the approved Prescribing Information and the supporting
           clinical data.  All of the documentation and materials we have reviewed
           and provided to you during the course of this inquiry support this
           conclusion."

### STEVENS' November 6, 2003 Letter

39.    In or about September 2003, **STEVENS** learned that a GSK sales representative

had reported GSK's promotion of Wellbutrin for unapproved uses to the FDA and had sent the

FDA a copy of the promotional slide presentations used by Dr. H and a physician in California

(hereinafter "Dr. F").  Both slide presentations contained information and claims about

unapproved uses of Wellbutrin.

40.    On or about November 6, 2003, **STEVENS** sent a letter to the FDA in which she

stated that the issues raised by the sales representative "do not present any new issues."  With the

letter, **STEVENS** produced to the FDA only the Dr. H and Dr. F slide sets she knew the FDA

had already received from the sales representative.  **STEVENS** did not provide the FDA with

other promotional slides that GSK had gathered from Dr. H and others.

41.     In her November 6, 2003 letter to the FDA, **STEVENS** further sought to mislead

the FDA and deter further investigation or enforcement action by stating:

> "Although there were isolated deficiencies, the objective evidence clearly
> demonstrates that GSK has not developed, maintained, or encouraged promotional
> plans or activities to promote, directly or indirectly, Wellbutrin SR for weight
> loss, the treatment of obesity, or any other unapproved indication."

42.     By November 6, 2003, **STEVENS** knew that GSK had held what was likely more

than 1,000 programs that were led by speakers whose presentation materials included off-label

information about Wellbutrin, and thus that these were not "isolated deficiencies."

## COUNT ONE
### (Obstruction of a Proceeding)

1.     Paragraphs 1 through 42 of the Introductory Allegations are incorporated here.

2.     From in or about October 2002 and continuing through at least in or about January

2004, in the District of Maryland and elsewhere, the defendant,

### LAUREN STEVENS,

in a matter within the jurisdiction of the FDA, the Department of Health and Human Services

(HHS), and the Department of Justice (DOJ), agencies of the executive branch of the government

of the United States, attempted to and did corruptly obstruct, influence, and impede an official

proceeding, by making false and misleading statements to the FDA, and by withholding and

concealing documents and other information about promotional activities by GSK for

Wellbutrin, including for unapproved uses, while representing that she had completed the

response to the FDA.

18 U.S.C. § 1512(c)(2)
18 U.S.C. § 2

13

## COUNT TWO
### (Falsification/Concealment of Documents)

1.    Paragraphs 1 through 42 of the Introductory Allegations are incorporated here.

2.    From in or about October 2002 through at least in or about January 2004, in the

District of Maryland and elsewhere, the defendant,

### LAUREN STEVENS,

in a matter within the jurisdiction of the FDA, HHS, and DOJ, agencies of the executive branch

of the government of the United States, knowingly altered, concealed, covered up, and falsified

records, documents, and tangible objects with the intent to impede, obstruct, and influence the

investigation and proper administration of a matter within the jurisdiction of the FDA, HHS, and

DOJ, agencies of the United States, and in relation to and contemplation of any such matter, in

that she sent false letters, falsified and altered documents, and concealed and covered up

evidence of promotional activities including gifts and entertainment by GSK to promote sales of

Wellbutrin, including for unapproved uses.


18 U.S.C. § 1519
18 U.S.C. § 2

14

## COUNT THREE
### (False Statement)

1.    Paragraphs 1 through 42 of the Introductory Allegations are incorporated here.

2.    On or about February 28, 2003, in the District of Maryland and elsewhere, the

defendant,

### LAUREN STEVENS,

in a matter within the jurisdiction of the FDA, an agency of the executive branch of the

government of the United States, knowingly and willfully falsified, concealed, and covered up by

a trick, scheme, and device a material fact and made a materially false, fictitious, and fraudulent

statement and representation, that is, she sent a letter to the FDA, which included the following

statements regarding GSK's activities from January 1, 2001, through October 9, 2002:

"GSK has not developed, devised, established, or maintained any program or
activity to promote or encourage, either directly or indirectly, the use of
Wellbutrin SR as a means to achieve weight loss or treat obesity."

* * *

"GSK's promotional material and activities for Wellbutrin SR are consistent with
the approved Prescribing Information and the supporting clinical data."

* * *

"As noted, GSK has not developed or maintained promotional plans or activities
to directly or indirectly promote Wellbutrin SR for weight loss or the treatment of
obesity."

* * *

"GSK has two types of advisory boards – National Advisory Boards and Local
Advisory Boards. . . . GSK, through its field-based Market Development
Managers, has established Local Advisory Boards in certain sales regions for the
purpose of obtaining specific advice from health care professionals in that locale
for Wellbutrin SR and/or issues relating to the therapeutic area of depression.
Pursuant to GSK policy, no sales region may have more than two Local Advisory
Boards, and no such board may meet more than twice per year."

15

3. In fact, **STEVENS** knew that GSK had maintained programs and activities that directly and indirectly promoted and encouraged the use of Wellbutrin as a means to achieve weight loss and treat obesity.

4. **STEVENS** also knew that a substantial number of GSK's promotional materials and activities for Wellbutrin from January 1, 2001, through October 9, 2002, contained information that was not consistent with the approved prescribing information and supporting clinical data.

5. In fact, **STEVENS** also knew that, in addition to national and local advisory boards, GSK held another type of advisory board, known as "special issue boards," relating to Wellbutrin and that these special issue boards met significantly more than twice per year per sales region.

18 U.S.C. § 1001
18 U.S.C. § 2

16

## COUNT FOUR
### (False Statement)

1.     Paragraphs 1 through 42 of the Introductory Allegations are incorporated here.

2.     On or about March 28, 2003, in the District of Maryland and elsewhere, the

defendant,

### LAUREN STEVENS,

in a matter within the jurisdiction of the FDA, an agency of the executive branch of the

government of the United States, knowingly and willfully falsified, concealed, and covered up by

a trick, scheme, and device a material fact and made a materially false, fictitious, and fraudulent

statement and representation, that is, she sent a letter to the FDA which included the following

statement regarding GSK's speaker program activities from January 1, 2001, through October 9,

2002:

> "Attendees were not paid, reimbursed, or otherwise compensated to attend these
> events, with the exception of reimbursement for parking fees in some cases."

3.     In fact, **STEVENS** knew that GSK had provided gifts and entertainment to the

attendees of these programs and had removed information listing such activities from an earlier

version of the "Event Spreadsheet" that she provided to the FDA as an Appendix to this letter.

18 U.S.C. § 1001
18 U.S.C. § 2

## COUNT FIVE
### (False Statement)

1.     Paragraphs 1 through 42 of the Introductory Allegations are incorporated here.

2.     On or about May 21, 2003, in the District of Maryland and elsewhere, the

defendant,

### LAUREN STEVENS,

in a matter within the jurisdiction of the FDA, an agency of the executive branch of the

government of the United States, knowingly and willfully falsified, concealed, and covered up by

a trick, scheme and device a material fact and made a materially false, fictitious, and fraudulent

statement and representation, that is, she sent a letter to the FDA which included the following

statements regarding GSK's activities from January 1, 2001, through October 9, 2002:

> "[W]e systematically and carefully collected, reviewed and provided you with
> extensive information and supporting documentation regarding GSK's
> promotional and non-promotional activities relating to Wellbutrin SR and weight
> loss. . . .  In the final analysis, all of the information consistently and clearly points
> to the same conclusion – GSK has not developed, devised, established, or
> maintained any program or activity to promote, either directly or indirectly, the
> use of Wellbutrin SR to achieve weight loss or treat obesity."

* * *

> "GSK's promotional material and activities for Wellbutrin SR are consistent with
> the approved Prescribing Information and the supporting clinical data."

* * *

> "The extensive information that we have provided . . . objectively demonstrates
> that GSK has not engaged in the promotion of Wellbutrin SR for weight loss."

* * *

> "With this final submission, we complete our production of information and
> documents in response to the requests in your letter dated October 9, 2002 and
> additional requests raised in your teleconference with GSK on January 21, 2003
> concerning Wellbutrin SR."

3.    In fact, **STEVENS** knew that GSK had collected information which showed that GSK's paid speakers for Wellbutrin were presenting materials about unapproved uses of Wellbutrin during promotional events sponsored by GSK and that GSK had maintained programs and activities that directly and indirectly promoted Wellbutrin for weight loss and to treat obesity.

4.    **STEVENS** also knew that a substantial number of GSK's promotional materials and activities for Wellbutrin from January 1, 2001, through October 9, 2002, contained information that was not consistent with the approved prescribing information and supporting clinical data.

5.    **STEVENS** knew that GSK had engaged in the promotion of Wellbutrin for weight loss and to treat obesity and that she had not provided to the FDA materials that showed that GSK's top speakers for Wellbutrin were promoting Wellbutrin for weight loss and other unapproved uses, even though the FDA had specifically requested such information and **STEVENS** had promised to produce such information to the FDA.

18 U.S.C. § 1001
18 U.S.C. § 2

## COUNT SIX
### (False Statement)

1.    Paragraphs 1 through 42 of the Introductory Allegations are incorporated here.

2.    On or about November 6, 2003, in the District of Maryland and elsewhere, the

defendant,

### LAUREN STEVENS,

in a matter within the jurisdiction of the FDA, an agency of the executive branch of the

government of the United States, knowingly and willfully falsified, concealed, and covered up by

a trick, scheme, and device a material fact and made a materially false, fictitious, and fraudulent

statement and representation, that is, she sent a letter to the FDA, which included the following

statement regarding GSK's activities from January 1, 2001, through October 9, 2002:

> "Although there were isolated deficiencies, the objective evidence clearly
> demonstrates that GSK has not developed, maintained, or encouraged promotional
> plans or activities to promote, directly or indirectly, Wellbutrin SR for weight
> loss, the treatment of obesity, or any other unapproved indication."

3.    In fact, **STEVENS** knew that GSK's deficiencies were not isolated, but rather that

GSK had maintained extensive promotional plans and activities that directly and indirectly

promoted Wellbutrin for weight loss, the treatment of obesity, and other unapproved indications,

and that she had not provided to the FDA information that showed that GSK's top speakers for

Wellbutrin were promoting Wellbutrin for weight loss, the treatment of obesity, and other

unapproved indications, even though the FDA had specifically requested such information and

**STEVENS** had promised to produce the information to the FDA.

18 U.S.C. § 1001
18 U.S.C. § 2

20

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson of the Grand Jury

JACK W. PIROZZOLO
FIRST ASSISTANT U.S. ATTORNEY
DISTRICT OF MASSACHUSETTS

SARA MIRON BLOOM
ASSISTANT UNITED STATES
ATTORNEY

TONY WEST
ASSISTANT ATTORNEY GENERAL
U.S. DEPARTMENT OF JUSTICE

PATRICK JASPERSE
TRIAL ATTORNEY
OFFICE OF CONSUMER LITIGATION

Date:   April 13, 2011